IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION

LISA THOMPSON, AS NATURAL MOTHER
AND NEXT FRIEND OF T.S., A MINOR                         PLAINTIFF

VS.                            CIVIL ACTION NO. 5:09-cv-124(DCB)(JMR)

REMINGTON ARMS COMPANY, INC.,
SPORTING GOODS PROPERTIES, INC.,
E.I. duPONT de NEMOURS AND COMPANY,
JOHN DOES 1 THROUGH 10                                   DEFENDANTS

MEMORANDUM OPINION AND ORDER

This cause is before the Court on the defendants' motion for summary judgment **(docket entry 31)**, motion to exclude expert opinions **(docket entry 33)**, and motion to strike supplemental expert affidavit **(docket entry 48)**. Having carefully considered the motions, responses, memoranda, exhibits and applicable law, and being fully advised in the premises, the Court finds as follows:

This is a product liability action involving a Remington Model 11 12-gauge autoloading shotgun. On the morning of July 12, 2006, the minor plaintiff, "T.S.," was at his home, unsupervised, with three teenage friends. The four of them gathered in a back bedroom to handle the shotgun. T.S. claims he unloaded the gun and was attempting to clean it with the safety on. T.S. Depo., pp. 65-70. Another teenager, "Z.S.," has testified that T.S. was cycling live ammunition through the shotgun's action to settle an argument over how many shells the shotgun would hold. Z.S. Depo., pp. 25-28. In any event, the shotgun discharged while T.S. was handling it,

resulting in injury to his side, arm and hand. The plaintiff alleges that the defendants are liable under the Mississippi Product Liability Act for manufacturing and selling a shotgun that is defective in design, construction and/or warning. Complaint, pp. 3-4.

The parties agree that there are three possible fact scenarios that could explain how the shotgun discharged:

>  (1) When T.S. manually depressed the barrel with the gun loaded and pointed at himself, the trigger was somehow inadvertently pulled;
>
>  (2) When T.S. manually depressed the barrel with the gun loaded and pointed at himself, he "jarred" the gun and it discharged; or
>
>  (3) When T.S. manually depressed the barrel with the gun loaded and pointed at himself, the absence of a fiber cushion allowed the rear of the receiver to come in contact with the firing pin.

See Defendant's Memorandum, p. 4; see also plaintiff's expert, John R. Nixon's Deposition, pp. 61-62 (acknowledging the three possibilities).

In their motion, the defendants assert that under any of the three scenarios, the pleadings, discovery, disclosure and affidavits on file show that there is no genuine issue for trial, and the defendants are entitled to judgment as a matter of law. The plaintiff contends that the discovery, affidavits and other materials in the record show that there are disputed issues of material fact requiring a trial.

Rule 56(c) of the Federal Rules of Civil Procedure authorizes

summary judgment where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. 244 (1986).

In order to recover under Mississippi's strict product liability law, the plaintiff must show that a defect in the product rendered it unreasonably dangerous, that the defect existed at the time the product left the hands of the manufacturer, and that the defect caused the plaintiff's injury. Hammond v. Coleman Co., Inc., 61 F.Supp.2d 533, 536 (S.D. Miss. 1999).

In Cather v. Catheter Technology Corp., 753 F.Supp. 634 (S.D. Miss. 1991), the court noted that "the existence of a product defect must be established before recovery may be had in strict liability." Id. at 638. The court further held:

> As defendant has pointed out, plaintiff has simply failed to place before this Court any evidence of design or manufacturing defect other than the mere conclusory allegation that, because the catheter broke, there must have been some defect in its design or in the materials with which it was produced ... Mere proof of damage following the use of a product is not sufficient to establish liability ... The doctrine of strict liability

3

> does not make a case for the plaintiff merely by its pleading and is not the equivalent of the doctrine of res ipsa loquitur, which is a distinct and separate rule of circumstantial evidence ... The pleading of conclusory allegations does not, standing alone, create an issue of fact before the Court when it is considering a motion for summary judgment, and some scintilla of evidence must be placed before the Court in order to defeat the granting of the motion. Here, Plaintiff has presented no such evidence.

Id. at 638-39 (citations omitted).

On the other hand, the court in Cather pointed out that under Mississippi law, "it is unnecessary to prove a specific, identifiable defect in a cause of action based on strict liability." Id. at 639. Instead, the plaintiff "must at least produce that minimal amount of circumstantial evidence that would allow a jury to infer a defective quality in the product." Id. (citations omitted).

The Remington Model 11 shotgun which is the subject of this case was manufactured by Remington in 1927. The plaintiff's expert gives the following history of the Remington Model 11:

> The long recoil operated shotgun was patented by John M Browning on 9 Oct 1900 - patent 659,507. John M Browning is the most prolific firearms inventor in history, and would have been recognized as such around the time this patent was filed. The basic Browning design has been produced by a number of manufacturers over the years, most notably Fabrique Nationale (FN) in Belgium, and Remington Arms in the United States. Browning called his gun the Auto 5, and in 1905 he licensed production rights to Remington Arms Co. Remington marketed their version of the shotgun as the Remington Model 11. The Model 11 was produced from 1905 until 1948. In 1949 a redesigned version of the Model 11 was marketed as the Model 11-48, and this model was discontinued in 1968.

4

> The guns produced by the various manufacturers between 1905 and 1948, while essentially conforming to the Browning patent, were not identical in their design. The FN guns had a machined rear receiver that incorporated a recess to provide clearance for the firing pin when the breech block was in the rearmost position. The Remington Model 11 had a fabricated rear receiver that incorporated a fiber buffer (or cushion) to arrest the recoiling breech block. The fiber cushion had a relieved lower central section to provide clearance for the firing pin.

Nixon Report on Remington Model 11 Shotgun, p. 3. It is the presence of the "fiber buffer" in the design of the Model 11 that, according to the plaintiff's first theory of liability, makes the product defective. This theory rests on fact scenario number 3. The plaintiff's expert gives the following description of the manual operation of the Remington Model 11:

> When the barrel of a Remington Model 11 shotgun is manually depressed, the bolt is moved to the rear and, at the same time, the hammer is rotated rearward and downward, where it is held in the cocked position. The locking block remains locked in the barrel extension during this rearward movement – thereby keeping the barrel and bolt locked together. When the bolt assembly reaches the limit of its rearward travel, the firing pin is safely accommodated by a recess in the fiber buffer, and the bolt is held in that location while the barrel is forced forward by the large spring that is located around the magazine tube that is housed under the wooden forearm. As the barrel moves forward, the live round from the chamber is held rearward on the face of the bolt. As the barrel reaches the forward position the bolt is released and commences its forward travel. The live cartridge is ejected from the gun, and a new round of ammunition is fed from the magazine into the chamber. As the bolt closes the locking block moves upward and the barrel and bolt are locked together so that the gun may be safely discharged. While the bolt is travelling [sic] forward the safety sear prevents rearward movement of the trigger, but does not in any way restrain the hammer. If the operator does not fire the new cartridge now in the chamber, the hammer remains in the cocked position. The

5

> operator may now repeat the process, only this time the
> hammer is not re-cocked because it has remained cocked
> from the previous cycle.

Nixon Affidavit, p. 2. The plaintiff contends that at the time the subject gun was manufactured, it was known to Remington that inclusion of the fiber buffer constituted a defect in the design of the Model 11:

> The fiber buffer had a notoriously short lifespan, and once they had disintegrated the breech block was free to move further to the rear, which resulted in the rear of the firing pin striking the rear of the receiver. This situation would result in a chambered cartridge being discharged, irrespective of whether or not the safety was engaged, or the trigger actuated.
>
> Remington designer Crawford Loomis recognized that the disintegrating buffers were a problem, and on 25 Oct 1927 he was granted patent 1,646,699 - assigned to Remington Arms. The patent was for a redesigned buffer that was both longer lasting and better affixed to the rear of the receiver. Remington chose to ignore the problem, and the Loomis solution, and continued to produce the Model 11 with the defectively designed receiver and buffer system.

Nixon Report on Remington Model 11 Shotgun, p. 3.

In this case, the eyewitnesses to the accident essentially agree on the manner in which T.S. handled the shotgun. They agree that T.S. was holding the loaded shotgun with the butt against the floor while, with his hand directly over the end of the muzzle, he began manually working the shotgun's action by depressing the barrel down. They also agree that he did this twice, and on the second depression of the barrel the shotgun discharged. T.S. Depo., pp. 65-70; Z.S. Depo., pp. 25-28; F.S. Depo., pp. 33-34; K.B. Depo., p. 59.

The parties agree that, in order for the gun to discharge under fact scenario 3, the barrel would have to be "fully depressed," or "pushed all the way down." They disagree, however, on how far T.S. had actually depressed the barrel the second time, immediately prior to discharge. The defendants contend that the testimony of the eyewitnesses shows T.S. had only depressed the barrel part way down, about an inch or two. T.S. Depo., pp. 70-71; Z.S. Depo., pp. 39-40. The plaintiff, on the other hand, contends that T.S. indicated that he could not remember if the barrel was pushed all the way down or not, and that Z.S. stated "that he was unsure how far the barrel was depressed - thereby indicating that he had no reference point from which to assert that it was depressed more the first time than the second time." Plaintiff's Memorandum, pp. 7-8 (citing T.S. Depo., p. 69; Z.S. Depo., p. 39).

The Court finds that there is a genuine issue of material fact concerning whether the barrel was fully depressed at the time of discharge. The defendants also argue that assuming the fiber buffer constituted a design defect, and assuming the gun discharged in accordance with fact scenario number 3, the plaintiff cannot recover under this theory because there is no evidence that the fiber buffer disintegrated. It could just as easily, the defendants claim, have been removed and not replaced by a prior owner of the gun. The plaintiff maintains that there is sufficient evidence indicating disintegration. The Court finds that this is

7

a closer question, but since both sides depend on circumstantial evidence, the question of sufficiency of the evidence should be reserved for trial.

The plaintiff's second theory of liability, dependent on fact scenario number 2, is that the shotgun was defectively designed because, unlike the original Browning design "and all other known clones," it did not have "a solid steel rear receiver with a slot machined into it to accommodate the rear of the firing pin." The other models also "have [a] more secure round hammer pivot hole, and they have a firing pin block - locking block safety mechanism. ... The firing pin block - locking block safety systems incorporated into the other brands of guns stop the firing pin moving far enough forward to initiate a round of ammunition unless the locking block is in the uppermost position (i.e. the firing pin cannot strike the ammunition unless the bolt is fully closed and locked into the barrel rear extension)." Nixon Affidavit, p. 2. The plaintiff contends that the absence of a firing pin block safety and lack of a hammer block safety caused the gun to discharge when it was jarred.

The defendants counter this argument with evidence "that the trigger/hammer engagement surfaces of the subject shotgun had been ground down prior to the accident, rendering the shotgun susceptible to a 'jar off' firing. Further, the safety sear, which serves to prevent a 'jar off' while the barrel/bolt assembly is

moving rearward, was completely missing from the shotgun." Rebuttal Memorandum, p. 9. Thus, the defendants contend that a substantial change in the condition of the gun after it was manufactured and sold prevents recovery by the plaintiff.

The plaintiff offers expert testimony that

> [t]he safety sear is effective in preventing the hammer from falling only when the manual safety is not engaged and an attempt is made to pull the trigger to the rear. It thereby prevents the gun from firing when the bolt is not fully forward (i.e. out of battery). Multiple witness testimony in this case is that the Plaintiff routinely applied the manual safety, that it was engaged at the time of the accident, and that the trigger was not pulled. Consequently, the absence of the safety sear in the subject gun is not a causal issue in this case.

Nixon Affidavit, p. 2.

The Court finds that there is enough of a genuine fact issue to prevent summary judgment at this stage in the proceedings, and the plaintiff should be allowed to proceed to trial. Finally, the defendants argue that the plaintiff has failed to present feasible design alternatives. The court finds that the plaintiff has addressed design alternatives, and whether he can meet the feasibility / sufficiency of evidence requirements is a matter better left to determination at trial.

Regarding the plaintiff's manufacturing defect claim, the defendants move for summary judgment and the plaintiff has failed to respond, thereby waiving this claim.

The plaintiff's failure to warn claim is also claimed by the defendants to be without a factual basis. The plaintiff alleges

9

that there are genuine issues of material fact. The Court finds this issue has not been sufficiently developed by the parties, and that summary judgment should therefore be denied. The Court reaches the same conclusion as to the plaintiff's claim for punitive damages.

As for the defendants' motion to exclude expert opinions, the Court finds that the opinions of John R. Nixon are properly before the Court for consideration in connection with the summary judgment motion. The defendants may of course make evidentiary objections and challenges to the witness's testimony at trial. Nixon's supplemental affidavit is also properly before the Court. An expert is allowed to supplement his report, as well as respond to matters raised by the defendants in a motion for summary judgment, as long as his supplementation does not add any new theories. The Court finds that no new theories were added. These motions shall therefore be denied. Accordingly,

IT IS HEREBY ORDERED that the defendants' motion for summary judgment **(docket entry 31)**, is GRANTED IN PART AND DENIED IN PART as follows:

GRANTED as to the plaintiff's manufacturing defect claim;

DENIED as to the plaintiff's design defect claim, failure to warn claim, and punitive damages claim;

FURTHER ORDERED that the defendants' motion to exclude expert opinions **(docket entry 33)** is DENIED;

FURTHER ORDERED that the defendants' motion to strike supplemental expert affidavit **(docket entry 48)** is DENIED.

SO ORDERED, this the 16th day of September, 2010.

/s/ David Bramlette
UNITED STATES DISTRICT JUDGE